J-S30011-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM A. JORDAN | : | |
| | : | |
| Appellant | : | No. 427 MDA 2020 |

Appeal from the Judgment of Sentence Entered July 24, 2018
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0000077-2018

BEFORE:   BENDER, P.J.E., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED NOVEMBER 23, 2021**

Appellant, William A. Jordan, appeals from the judgment of sentence of an aggregate term of 66 to 144 months' incarceration, imposed after he was convicted by a jury of delivery of a controlled substance (35 P.S. § 780-113(a)(30)), conspiracy to deliver a controlled substance (18 Pa.C.S. § 903(a)(1)), possession of a controlled substance with intent to deliver (35 P.S. § 780-113(a)(30)), possession of a controlled substance (35 P.S. § 780-113(a)(16)), possession of drug paraphernalia (35 P.S. § 113(a)(32)), and possession of marijuana (35 P.S. § 780-113(a)(31)).  Appellant raises various issues on appeal, including challenges to the sufficiency and weight of the evidence; a claim that the court erred by admitting prior bad acts evidence and denying his pretrial motion to suppress evidence; that his sentence is

---

[*] Retired Senior Judge assigned to the Superior Court.

excessive; and that the court lacked jurisdiction over his conspiracy charge. After careful review, we affirm.

The trial court set forth a detailed summary of the evidence presented at Appellant's trial in its Pa.R.A.P. 1925(a) opinion, which we adopt herein. *See* Trial Court Opinion (TCO), 5/7/21, at 3-11. Briefly, Appellant's convictions were premised on evidence that he sold cocaine to a "middleman," who moments thereafter sold the cocaine to a confidential informant (CI). Police were conducting surveillance of the CI when the drug sale occurred, and the CI was also outfitted with a recording device. When Appellant's vehicle was stopped moments after the drug transaction, he was smoking marijuana, and he had in his possession a small quantity of cocaine and a portion of the pre-recorded "buy money" the police had given to the CI to purchase the drugs.

Appellant was arrested and proceeded to a jury trial on May 1, 2018. At the close thereof, he was convicted of the above-stated offenses. On July 24, 2018, the court sentenced Appellant to the aggregate term set forth *supra*. He then filed a timely post-sentence motion. However, the court did not rule on that motion within 120 days, and the clerk of courts did not issue an order denying it by operation of law until January 31, 2020. Appellant filed his notice of appeal within 30 days of the January 31, 2020 order.[1] Appellant also timely

_____

[1] Where a trial court fails to rule on a timely-filed post-sentence motion within 120 days, the clerk of courts is required to enter an order denying the motion
*(Footnote Continued Next Page)*

complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On May 7, 2021, the trial court filed its Rule 1925(a) opinion. Herein, Appellant states the following six issues for our review, which we have reordered for ease of disposition:

1. Whether the trial court lacked subject matter jurisdiction over the criminal conspiracy to deliver charge[?]

2. Whether the evidence was insufficient to sustain a verdict of guilty beyond a reasonable doubt on the charges of delivery of a controlled substance, possession with intent to deliver and criminal conspiracy to deliver a controlled substance?

3. Whether the trial court abused its discretion in failing to find the verdict against the weight of the evidence as it relates to delivery and possession with intent to deliver, and conspiracy to deliver since the evidence related to same was so tenuous, vague and uncertain that the ultimate verdict is such that it shocks one's [conscience]?

4. Whether the trial court abused its discretion in allowing testimony and evidence regarding [Appellant's] prior criminal record to be admitted during the Commonwealth's direct examination on the basis that [Appellant] "opened the door" and thereafter in failing to grant a mistrial?

_____

by operation of law and serve that order on the parties. **See** Pa.R.Crim.P. 720(B)(3)(a), (c). A notice of appeal must then be filed within 30 days of the entry of that order. **See** Pa.R.Crim.P. 720(A)(2)(b). Here, the clerk of courts should have entered an order denying Appellant's timely post-sentence motion by operation of law on November 30, 2018, but it did not do so until January 31, 2020. We have held that a breakdown in the operations of the court occurs when the clerk fails to enter an order deeming post-sentence motions denied by operation of law. **See Commonwealth v. Patterson**, 940 A.2d 493, 498-99 (Pa. Super. 2007) (citation omitted). Therefore, because Appellant filed his notice of appeal within 30 days of the entry of the January 31, 2020 order denying his post-sentence motion by operation of law, we decline to quash his appeal.

5. Whether the trial court['s] denial of Appellant's motion to suppress evidence recovered after an illegal stop was supported by the record and free from legal error?

6. Whether the trial court abuse[d] its discretion by running each of the individual drug related offenses in [the] high-end of the standard range and running them consecutively thereby making the aggregate sentence unnecessarily harsh and unreasonable when neither his history nor his character warranted such a harsh and excessive sentence and in otherwise failing to explain or provide [an] adequate and/or proper basis for the excessive sentence?

Appellant's Brief at 3-4 (emphasis omitted).

In Appellant's first issue, he argues that the trial court lacked jurisdiction over the conspiracy to commit delivery charge, which was added to the charges pending against Appellant on April 16, 2018, when the Commonwealth filed an amended criminal information. Appellant's jury trial began on May 1, 2018. According to Appellant, the trial court lacked jurisdiction over this newly-added charge because the Commonwealth had not established, at a preliminary hearing, that it could make out a *prima facie* case for this offense.[2]

Appellant's arguments are waived and/or moot. First, in Appellant's Rule 1925(b) statement, he did not raise any challenge to the court's permitting the Commonwealth to amend the criminal information to add the conspiracy charge, and he cites no case law to support his assertion that this claim constitutes a non-waivable challenge to the jurisdiction of the court. We

_____

[2] Appellant also claims that the court lacked jurisdiction over the conspiracy charge because the Commonwealth failed to demonstrate that an overt act in furtherance of the conspiracy occurred in Pennsylvania. We address this claim *infra*. **See infra**, at 6 n.4.

- 4 -

conclude that it does not. Namely, Rule of Criminal Procedure 564, which governs the amendment of a criminal information, states that:

> The court may allow an information to be amended, provided that the information as amended does not charge offenses arising from a different set of events and that the amended charges are not so materially different from the original charge that the defendant would be unfairly prejudiced. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

Pa.R.Crim.P. 564. As Appellant recognizes, "[t]he purpose of Rule 564 is to ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed." Appellant's Brief at 52 (quoting **Commonwealth v. Sinclair**, 897 A.2d 1218, 1221 (Pa. Super. 2006) (citation omitted)). Thus, it is clear Appellant's challenge to the court's permitting the Commonwealth to amend the criminal information implicates due process and notice concerns, not the jurisdiction of the court. Therefore, Appellant waived this claim by failing to raise it in his Rule 1925(b) statement. **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").[3]

---

[3] We note that the court informed Appellant in its Rule 1925(b) order that "[a]ny issue not properly included in the Statement timely filed and served shall be deemed waived." Trial Court Order, 3/9/20, at 1 (single page); **see also Greater Erie Indus. Development Corp. v. Presque Isle Downs, Inc.**, 88 A.3d 222, 225 (Pa. Super. 2014) (*en banc*) ("[I]n determining whether an appellant has waived his issues on appeal based on non-compliance with Pa.R.A.P. 1925, it is the trial court's order that triggers an appellant's obligation[.] ... [T]herefore, we look first to the language of that order.") (citations omitted).

We also deem moot Appellant's claim that the trial court lacked jurisdiction over his conspiracy charge because the Commonwealth did not present a *prima facie* case for that offense at a preliminary hearing. It is well-settled that "[o]nce [the] appellant has gone to trial and been found guilty of the crime, any defect in the preliminary hearing is rendered immaterial." ***Commonwealth v. Tyler***, 587 A.2d 326, 328 (Pa. Super. 1991). In other words, "[a]n adjudication of guilt renders moot any allegation that the Commonwealth failed to establish a *prima facie* case." ***Commonwealth v. Lee***, 662 A.2d 645, 650 (Pa. 1995); ***see also Commonwealth v. McCullough***, 461 A.2d 1229, 1231 (Pa. 1983) (holding that the failure to establish a *prima facie* case at a preliminary hearing is clearly immaterial where at the trial the Commonwealth met its burden by proving the offense beyond a reasonable doubt). Accordingly, Appellant's first issue does not warrant relief.

In reviewing Appellant's remaining five issues, we have carefully examined the briefs of the parties, the certified record, and the applicable law. We also considered the detailed, 45-page opinion authored by the Honorable Michael J. Barrasse of the Court of Common Pleas of Lackawanna County. We conclude that Judge Barrasse adequately addresses the issues and arguments Appellant raises herein, and properly concludes that they are meritless.[4]

_____

[4] Judge Barrasse did not explicitly discuss Appellant's claim, raised for the first time on appeal, that the trial court lacked jurisdiction over the conspiracy
*(Footnote Continued Next Page)*

Accordingly, we adopt Judge Barrasse's well-reasoned decision as our own and affirm Appellant's judgment of sentence for the reasons set forth therein.[5]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/23/2021

_____

charge because there was no evidence that an overt act in furtherance of that conspiracy occurred in Pennsylvania. However, Judge Barrasse did conclude, for the reasons set forth in his assessment of Appellant's challenge to the sufficiency of the evidence, that "the overt act was [] Appellant's delivery of cocaine to Donald Miles at [] Miles' residence for [] Miles to sell on the street, including [to the CI]." TCO at 20. We agree. Accordingly, Appellant's jurisdictional claim is meritless.

[5] We note that Judge Barrasse addresses a claim that Appellant has abandoned on appeal. *See* TCO at 33-35 (discussing Appellant's claim that the court erred by failing to grant Appellant's request for a mistrial after evidence was admitted regarding his prior criminal record). We do not adopt, or assess the merits of, this portion of Judge Barrasse's decision.

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE COURT OF COMMON PLEAS OF LACKAWANNA COUNTY |
| v. | : | CRIMINAL DIVISION |
| WILLIAM JORDAN | : | 18 CR 77 |

## OPINION

This opinion is filed pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure and pursuant to the request of the Superior Court. The Appellant's grounds for appeal are as follows:

A. Whether there was insufficient evidence to convict for delivery of a controlled substance and possession with intent to deliver since there was insufficient evidence that Appellant delivered cocaine and the evidence failed to establish the necessary elements of intent and delivery necessary for possession with intent to deliver?

B. Whether there was sufficient evidence to convict for conspiracy since the evidence failed to establish that an agreement existed between the Appellant and another person which is a necessary element for conviction?

C. Whether the trial court abused its discretion in failing to find the verdict is against the weight of the evidence as it relates to delivery and possession with intent to deliver since the evidence related to same was so tenuous, vague, and uncertain that the ultimate verdict is such that it shocks one's conscious?

D. Whether the trial court abused its discretion in failing to find the verdict is against the weight of the evidence as it relates to conspiracy to deliver since the evidence as it relates to conspiracy was so tenuous, vague, and uncertain that the verdict related to same shocks one's conscious?

E. Whether the trial court erred, as a matter of law, and/or abused its discretion in allowing testimony and evidence regarding the Appellant's prior criminal record to be admitted during the trial on the basis that the Appellant "opened the door" to such evidence being allowed and/or at all since such evidence was overly prejudicial to the Appellant?

F. Whether the trial court erred, as a matter of law, and/or abused its discretion when it failed to grant Appellant's request for a mistrial after testimony and evidence regarding Appellant's prior criminal record was presented to the jury since the

unavoidable effect of not granting a mistrial was to deprive the Appellant of a fair trial?

G. Whether the trial court erred, as a matter of law, and/or abused its discretion in failing to allow relevant and competent evidence regarding the Commonwealth witnesses' probation files for purposes of impeachment which was part of the defense trial strategy?

H. Whether the trial court erred, as a matter of law, and/or abused its discretion in denying Appellant's Omnibus Pretrial Motion as it related to suppression since the Commonwealth lacked reasonable suspicion and/or probable cause to stop the Appellant's vehicle and any search and/or recovered evidence resulting from the improper stop should have been suppressed?

I. Whether the trial court imposed an illegal and/or overly harsh sentence by imposing each sentence in the high-end of the standard range and requiring each sentence to be run consecutively thereby making the aggregate sentence unnecessarily excessive, and in only focusing on the seriousness of the charges instead of the rehabilitative needs of the Appellant, and in otherwise failing to explain or provide adequate and/or proper basis for the excessive sentence?

## FACTUAL AND PROCEDURAL HISTORY

On December 13, 2017, the Commonwealth charged the Appellant, William Jordan through Criminal Information with one (1) count of Delivery of a Controlled Substance, 35 P.S. § 780-113(a)(30); one (1) count of Possession of a Controlled Substance With Intent to Deliver, 35 P.S. § 780-113(a)(30); one (1) count of Possession of a Controlled Substance, 35 P.S. § 780-113(a)(16); one (1) count of Possession of Drug Paraphernalia, 35 P.S. § 780-113(a)(32); and one (1) count of Possession of Marijuana, 35 P.S. § 780-113(a)(31). On April 16, 2018, the Commonwealth filed an Amended Criminal Information to include the additional offense of one (1) count of Criminal Conspiracy to Delivery a Controlled Substance, 18 Pa. C.S. § 903(a)(1). Subsequently, on May 1, 2018, the Commonwealth filed a second Amended Criminal Information to include the specific quantities of cocaine as to Count I: Delivery of a Controlled Substance, 35 P.S. § 780-113(a)(30), the Commonwealth alleged between 2.5 grams and 5

2

grams of cocaine, and as to Count III: Possession of a Controlled Substance With Intent to Deliver, **35 P.S. § 780-113(a)(30)**, the Commonwealth alleged less than 2.5 grams of cocaine.

Accordingly, on May 1, 2018, a two-day jury trial commenced. The Commonwealth presented Karl Racavitch, a reliable confidential informant, who truthfully and candidly described his addiction history, periods of sobriety, parole supervision, prior drug offenses and pending drug offenses. Importantly, Mr. Racavitch disclosed his personal knowledge of cocaine sales occurring in Lackawanna county. **(Notes to Transcript hereinafter "N.T." May 1, 2018 p. 9, 23, 25-26, 29, 33).** He testified to texting and placing recorded telephone calls with an individual known as Anthony Jordan. **Id.** at 9-10, 12. Specifically, Mr. Racavitch testified that while in the presence of Lackawanna County detectives, on December 13, 2017, he texted and telephoned Anthony Jordan about purchasing "a pool ball" quantity of cocaine. **Id.** at 11. Mr. Racavitch testified that he knew Anthony Jordan "as a source of getting [drugs]." **Id.** at 34. After being provided with three hundred ($300.00) dollars of pre-recorded serialized money, and outfitted with a recording device, the detectives searched Mr. Racavitch's person for the presence of any drugs, none were present. Thereafter, Mr. Racavitch met Anthony Jordan, who drove him to meet an individual known as Donald Miles. Upon meeting, Mr. Miles, the three males drive "around waiting for the connect to come with the product – with the cocaine." **Id.** at 15. He testified that during the drive, Mr. Jordan described several specific characteristics of the cocaine source. Importantly, that he would be driving a green BMW and possessed the street name "ATL." **Id.** at 48. Accordingly, Mr. Racavitch testified that Mr. Miles directed Mr. Jordan where to drive, then Mr. Miles exited the vehicle, and they parked in a nearby area. Prior to exiting the vehicle, Mr. Racavitch testified that he provided Mr. Miles with the three hundred ($300.00) dollars of pre-recorded serialized" buy money." Within ten (10) minutes, Mr. Miles

3

returned to the vehicle and provided Mr. Racavitch with the quantity of cocaine he requested in the text messages and recorded telephone calls. **Id.** at **17-18.** To appear less suspicious, Mr. Racavitch explained that he asked Mr. Miles how to "cook" his cocaine purchase into crack cocaine. **Id.** at **18-19, 22.** Mr. Racavitch indicated that he participated in "good talk just to make the transaction go through." **Id.** at 46.

Anthony Jordan corroborated Mr. Racavitch's testimony. He admitted that on December 13, 2017, detectives arrested him for drug-related offenses. **(N.T. May 1, 2018 p.m. p. 37, 47-48).** He explained that Donald Miles was his mother's paramour and he became closer to Mr. Miles when he moved back home. At which time, he became a "runner" assisting Mr. Miles with cocaine sales. **Id.** at **37-38; N.T. May 2, 2018 p. 23, 25, 36.** Mr. Jordan stated: "I had a phone call received from a person, a client, which is a buyer. I told Miles about the sale, and then he would persist on calling his plug, which is his dealer [ . . . ] he used his plug as his source of purchasing the cocaine [ . . . ] I was just his runner [ . . . ] basically someone that finds a person that's looking for it, and I take it from the, and send it to that person." **Id.** at **38-39.** Mr. Jordan described how he arranged a sale of an "eight ball" of cocaine with Mr. Racavitch in exchange for three hundred dollars ($300.00). Mr. Jordan testified:

> Since I got the phone call I was to pick up Karl at his house
> in West Side after he got out of work, I guess it was. I picked
> him up. We went straight from his house to down by my house
> [ . . . ] and picked up Donald. He then proceeded to tell me
> where to drive to. We drove through Scranton waiting for his
> plug to call, which was his dealer. We stopped at a Convenient
> Store in Scranton. Had a couple shots, and that's when I got the
> text that the dealer was coming at 6:30 [ . . . ] Donald was just
> pointing me in the direction to go. Pretty much, like, killing time.

**Id.** at **40-41.**

4

Mr. Jordan identified the Appellant as the dealer they were waiting for on December 13, 2017 because "that's the only one I ever meet. The only one that every came to the house." **N.T. May 2, 2018 p. 37.** He testified that the Appellant's street name was "ATL," but he also knew him as "William." **N.T. May 1, 2018 p.m. p. 41-42, 48, 51; N.T. May 2, 2018 p. 6,8-9, 12, 17, 26, 35-37.** Mr. Jordan related that he knew the Appellant because he frequented his mother's house on approximately six (6) occasions driving a distinct green BMW. **Id. at 42; N.T. May 2, 2018 p. 27, 34-35.** Mr. Jordan recalled Mr. Racavitch handing Mr. Miles money, Mr. Miles exiting his vehicle and returning after approximately ten (10) minutes. He observed Mr. Miles hand two clear bags of cocaine to Mr. Racavitch. **Id. at 43-44; N.T. May 2, 2018 p. 12-13, 16.** During Mr. Jordan's testimony, the Commonwealth published Mr. Jordan's written statement memorializing the December 13, 2017 incident as well as text messages between Mr. Jordan and Mr. Racavitch coordinating a cocaine purchase as well as text messages between Mr. Jordan and Mr. Miles, indicating that "we were waiting for ATL to meet - - well, he was waiting for ATL to meet [ . . . ] to purchase the cocaine for Karl." **Id. at 48-52; N.T. May 2, 2018 p. 5-9, 17.** The Commonwealth also played audio recordings that occurred inside his vehicle, wherein Mr. Jordan identified at length Mr. Miles' voice and explained Mr. Miles' drug slang. Additionally, Mr. Jordan identified at length Mr. Racavitch's voice and the locations of each conversation. **Id. at May 2, 2018 p. 10-17.** Lastly, identical to Mr. Racavitch's testimony, Mr. Jordan thoroughly testified that he had to "fit the picture," during drug transactions and you were expected to talk and act tough, especially if you were "a white boy." **N.T. May 2, 2018 p. 36-37, 38.**

Relative to the investigation, surveillance, and arrest that occurred on December 13, 2017, the Commonwealth presented two (2) detectives employed in the narcotics unit and one

5

(1) uniformed street crimes officer with an overall combined experience of twenty-four (24) years in "targeting, investigating, and arresting drug traffickers as they come into Lackawanna County to sell narcotics." **N.T. May 1, 2018 p. 52; May 2, 2018 p. 56-57; 68-70.** Detective Zech testified about his previous experience and varied roles as an undercover detective. **N.T. May 1, 2018 p. 53-54.** At length, Detective Zech explained the purpose of a confidential informant, the categories of informants, the credibility and reliability of informants, communications with informants, and the settings/ environments in which informants are utilized and outfitted with body wires and serialized currency as well as tactics informants employ to be less conspicuous. **Id. at 54-60.** On December 13, 2017, Detective Zech testified that he met Karl Racavitch, who provided him information about a middle-man named Anthony Jordan and the sales of cocaine in Lackawanna county. **Id. at 61-62.** Detective Zech observed text messages and a phone call to Anthony Jordan wherein Mr. Racavitch arranged a purchase of an "eight ball," of cocaine priced at three hundred dollars ($300.00). **Id. at 63.** Detective Zech stated:

> After the phone call was made and after I intercepted text messages arranging the deal, a strip search was conducted of his person. He was given buy money, $300 by me. I provided him transportation to his residence, gave him a covert audio recorder to wear so I could hear everything happening live. He stood in his doorway of his home, waited for Anthony Jordan to arrive. And I was subsequently, catty-corner across the street in my undercover vehicle with detectives in the immediate surrounding area getting ready to do surveillance, mobile surveillance because we knew a vehicle was going to be involved.

**Id. at 64.**

The Commonwealth published a "buy sheet," which Detective Zech explained as "photocopies of the monies that were given to Karl Racavitch to buy the drugs in this investigation [ . . . ] issued and signed by Karl Racavitch prior to leaving the building." **Id. at 65-66; N.T. May 1,**

6

**2018 p.m. p. 34.** Further, Detective Zech explained the unique serial numbers found on the bottom-right hand corner of each bill within the "buy money." **Id. at 66.**

Next, Detective Zech corroborated the testimony of Mr. Racavitch and Mr. Jordan. He testified:

> We observed a silver Toyota arrive in front of Karl's residence Karl exited the front door, entered who is now Anthony Jordan's vehicle. There is a live wire going. And we hear that they are travelling down to the Court Street/Albright Avenue section near Ritter's bar to pick up the black male which would be Donald Miles at the time [ . . . ] We are conducting surveillance following this vehicle and all officers are listening live to all audio recording that's taking place inside the car with Karl, Donald Miles, and Anthony Jordan. And we are listening to it live time. And we are hearing that they are just aimlessly driving around waiting for a supplier [ . . . ] once inside the car, we were under the notion that Donald was going to have the drugs and that the sale was going to take place rather quickly. We soon learned that, no, it wasn't going to take place that we had to wait for Donald Miles' source to come so he could meet them to buy the cocaine [ . . . ] Donald Miles exited the vehicle. We saw him go inside and come out with -- later to be determined to be beer. It was at his feet later at the time when he was arrested [ . . . ] I could hear the informant in the vehicle getting impatient asking questions and then later we hear the money exchange go to Donald Miles inside the car [ . . . ] After Donald Miles exited the vehicle, Anthony Jordan began to talk about Donald Miles' source and that he would be arriving in a BMW and began to talk about him pretty explicitly. So I notified the other detective to keep an eye out, let me know if you see a BMW coming into play here. So I see Donald Miles get out and walk probably about a block, half a block to Grove Street and then go to ultimately which would be his – I later find out it's his home. It's his address. Within minutes, Detective Davis notifies me on our closed radio frequency a BMW is coming your way, Harold. That BMW comes into play. It's a sedan. It parks right in the area where Donald Miles' residence is across the street. A black male gets out and walks to the area where Donald Miles is last seen going. And within minutes, probably 10 minutes, they come out together and are walking with each other. The black male goes to the green BMW. Donald Miles separates from him and walks back to the vehicle that is parked waiting a block away.

**Id. at 67-70.**

7

Subsequently, Detective Zech identified the Appellant as the black male observed driving the green BMW and exiting Donald Miles' home. **Id.** at **70-71.** Based upon the totality of the circumstances, the descriptions and characteristics of the cocaine source, especially the arrival of the green BMW, the live audio recordings waiting for the source to arrive, and Donald Miles' return to Anthony Jordan's vehicle, delivering the cocaine, Detective Zech notified officers to effectuate a traffic stop on the green BMW. **Id.** at **71-72.** Detective Zech testified: "Once Donald got in that car, I hear the cocaine transaction occur. So I know that a traffic stop could be done on that car as well as the BMW." **Id.** at **72.**

Upon completion of the traffic stop, Detective Zech described the contents of the Appellant's vehicle and the items seized from the Appellant's person. The Commonwealth published a baggie of marijuana found on the Appellant's person, as well as one bag of powdered cocaine, identified by Detective Zech as items that "fairly and accurately" depicted items seized from the Appellant and the Appellant's vehicle. **Id.** at **75-77.** Lastly, Detective Zech identified two (2) cell phones seized from the Appellant and five hundred and eighty dollars ($580.00) of currency. **Id.** at **77-79.** Notably, he testified that commingled in the Appellant's five hundred and eighty dollars ($580.00) was one hundred and ninety dollars ($190.00) of Mr. Racavitch's serialized "buy money." **Id.** at **79-80.**

Located inside Mr. Jordan's vehicle, Detective Zech testified that a bag of cocaine was recovered underneath Donald Miles' seat, and another bag of cocaine on the floor. **Id. at 82.** Detective Zech identified the bags as "fairly and accurately," depicted. **Id. at 82-83.** Similarly, he testified that one hundred and ten dollars ($110.00), the remainder of Mr. Racavitch's serialized "buy money" was recovered from Donald Miles' person. **Id. at 84-85.** Detective Zech explained that Mr. Racavitch's serialized "buy money" had been divided between the

8

Appellant and Donald Miles, with the Appellant possessing the larger amount of "buy money." He noted the division of the profit was indicative of their roles in the drug operation as source/supplier and middle-man. **Id.** at **85,89; N.T. May 1, 2018 p.m. p. 34.**

Thereafter, Detective Zech observed Mr. Jordan execute a written statement, which further corroborated the investigation and arrest. **Id.** at **87**. Also, Detective Zech testified that he reviewed and photographed text messages between Mr. Jordan and Mr. Miles, which arranged the meeting with his supplier, the Appellant to purchase the cocaine. **Id.** at **87-88**. To that end, the Commonwealth published the text messages which identified the cocaine source as the Appellant. **Id.** at **88-89**.

The Commonwealth presented Detective John Munley, who further corroborated Detective Zech's testimony as to the surveillance of events on December 13, 2017. He stated: "I was there when he interviewed Karl Racavitch, the confidential informant [ . . . ] I went out in the street to conduct surveillance the best we could on the drug purchase. And I was part of the arrest team when that happened." **N.T. May 2, 2018 p. 57.** Like Detective Zech, Detective Munley listened live to the covert audio recordings, while conducting surveillance. He testified:

> I was conducting surveillance on Karl when he got picked up.
> When they drove around and picked up Donald Miles, I was
> conducting surveillance on the car with other officers. I
> wasn't the only one watching [ . . . ] but we were rotating in
> and out of the target vehicle. We were keeping it under
> surveillance [ . . . ] we can hear live conversation going on in the
> car, and Donald was explaining that he didn't have drugs, that he had
> to wait for his source to show up [ . . . ] we later learned that a green
> BMW was going to be showing up [ . . .] we were hearing word of
> another source. We were hearing word of ATL. We were hearing
> word of a green BMW [ . . .] all of that information wasn't from
> the CI, but that was being corroborated through what I was hearing
> on the live audio transmitter [ . . .] through radio communication
> Detective Zech notified me that the green BMW did arrive.

**Id.** at **58-60, 63.**

9

Ultimately, Detective Munley testified that he conducted a traffic stop of Anthony Jordan's vehicle. During the traffic stop, he observed Donald Miles reaching towards the floor. On the floor, in plain view, Detective Munley observed a bag of cocaine, and later he recovered a second bag of cocaine under Mr. Miles' seat. Id. at 62. He searched Mr. Miles and recovered one hundred and ten dollars ($110.00) of Mr. Racavitch's serialized "buy money" as well as a cell phone. Id. Like Detective Zech, Detective Munley also observed Anthony Jordan execute a written statement, which corresponded with Mr. Jordan's testimony and the events that occurred on December 13, 2017. Id. at 64.

Finally, the Commonwealth presented Lauren Force, a forensic scientist employed by the Pennsylvania Bureau of Forensic Services, Wyoming Regional Laboratory. Ms. Force testified as an expert in identification and analysis of controlled substances. She explained: "evidence that is suspected to contain controlled substances is received at the laboratory at which point it is assigned out to an analyst." Id. at 41. Ms. Force testified at length regarding the variety of tests employed to verify a specific controlled substance as well as the procedures utilized to log evidence, ensure zero discrepancies, and ultimately draft a report with conclusions. Id. at 42-44. During her testimony, the Commonwealth published Ms. Force's report, which confirmed the recovered substances as cocaine and marijuana. Id. at 44,48. She explained:

> I received a total of six envelopes noted as items one
> through six [ . . . ] the substance in item 1.1 weighed 2.63
> grams plus or minus 0.01 grams and contained cocaine [. . .]
> Item five I concluded that the vegetable matter in item 5.1
> weighed 1.94 grams plus or minus 0.01 grams and contained
> marijuana [ . . . ] this is item six, which is marked as one
> knotted bag containing suspected cocaine [ . . . ] I can use
> the FTIR to identify cocaine for conclusions six [ . . . ]
> [1.06 ] grams [ . . . ] approximately, yes.

Id. at 45-46,49, 51.

10

She concluded that her findings were "made to a reasonable degree of scientific certainty." Id. at 49-50.

Accordingly, after observing all of the evidence presented in the above-captioned case, as well as receiving several instructions provided by this Court, the jury found the Appellant guilty as to all six (6) counts: one (1) count of Delivery of a Controlled Substance, 35 P.S. § 780-113(a)(30); one (1) count of Criminal Conspiracy to Delivery a Controlled Substance, 18 Pa. C.S. § 903(a)(1); one (1) count of Possession of a Controlled Substance With Intent to Deliver, 35 P.S. § 780-113(a)(30); one (1) count of Possession of a Controlled Substance, 35 P.S. § 780-113(a)(16); one (1) count of Possession of Drug Paraphernalia, 35 P.S. § 780-113(a)(32); and one (1) count of Possession of Marijuana, 35 P.S. § 780-113(a)(31).

This Court ordered a pre-sentence investigation report. Thereafter, in preparation for sentencing, this Court thoroughly reviewed the Sentencing Guidelines, as well as the pre-sentence investigation report and on July 24, 2018, upon considering the Appellant's underlying criminal conduct, extensive history, and the particularized facts presented during trial, as well as arguments by counsel, this Court imposed standard guideline range sentences to be served consecutively, as follows: Count I: Delivery of a Controlled Substance, 35 P.S. § 780-113(a)(30)- twenty-seven (27) – sixty (60) months with two (2) years special probation; Count II: Criminal Conspiracy to Delivery a Controlled Substance, 18 Pa. C.S. § 903(a)(1)- eighteen (18) – thirty-six (36) months with two (2) years special probation; Count III: Possession of a Controlled Substance With Intent to Deliver, 35 P.S. § 780-113(a)(30) – twenty-one (21) to forty-eight (48) months with two (2) years special probation; Count IV: Possession of a Controlled Substance, 35 P.S. § 780-113(a)(16)-merged with Count III; Count V: Possession of Drug Paraphernalia, 35 P.S. § 780-113(a)(32)- one (1) year special probation; Count VI:

11

Possession of Marijuana, **35 P.S. § 780-113(a)(31)**- $300.00 fine. Accordingly, this Court imposed an aggregate sentence of sixty-six (66) to one hundred and forty-four (144) months with seven (7) years of special probation.

The Appellant filed post-trial motions and a memorandum, which were deemed denied by operation of law on January 31, 2020. This Court appointed appellate counsel and the Appellant filed a timely Notice of Appeal to the Pennsylvania Superior Court on February 27, 2020.

## DISCUSSION

A. **Whether there was insufficient evidence to convict for delivery of a controlled substance and possession with intent to deliver since there was insufficient evidence that Appellant delivered cocaine and the evidence failed to establish the necessary elements of intent and delivery necessary for possession with intent to deliver?**

B. **Whether there was sufficient evidence to convict for conspiracy since the evidence failed to establish that an agreement existed between the Appellant and another person which is a necessary element for conviction?**

The Appellant's claims A and B contend that there is insufficient evidence to sustain his convictions on Count I, Delivery of a Controlled Substance; Count II: Criminal Conspiracy to Commit Delivery of a Controlled Substance, and Count III: Possession With Intent to Deliver a Controlled Substance. The Appellant claims that no witnesses observed him deliver a quantity of cocaine to Donald Miles, especially in an uncontrolled environment where Donald Miles had the opportunity to obtain the cocaine inside his residence or inside a store. The Appellant also claims that no evidence of an explicit agreement with Donald Miles to deliver cocaine existed, where there was no evidence of text messages or phone calls. Finally, the Appellant claims that the totality of the circumstances showed he possessed one (1) gram of cocaine for personal use nor did he possess a large sum of money.

The standard of review in assessing whether there was sufficient evidence to sustain

12

Appellant's convictions is well settled:

> In reviewing the sufficiency of the evidence, [the Court] must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt [ . . . ] [the Court] may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

Commonwealth v. Thomas, 988 A.2d 699, 670 (Pa. Super. 2009), *appeal denied* 4 A.3d 1054 (Pa. 2010); See also Commonwealth v. Hewlett, 189 A.3d 1004, 1008 (Pa. Super. 2018)(the Commonwealth may sustain its burden with wholly circumstantial evidence, and we defer to the finder of fact in matters of credibility).

Viewing the evidence in the light most favorable to the Commonwealth, the verdict winner, this Court finds that there was sufficient evidence from which the jury could conclude that the Appellant was guilty as to Count I, Count II, and Count III.

Delivery of a Controlled Substance, 35 P.S. § 780-113(a)(30) is defined in relevant part as follows:

> [T]he manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

Id.

"[F]or a defendant to be liable as a principal for the delivery of a controlled substance there must be evidence that he knowingly made an actual, constructive, or attempted transfer of a controlled substance to another person without the legal authority to do so." Commonwealth v. Murphy, 844 A.2d 1228, 1234 (Pa. 2004). "A defendant actually transfers drugs whenever he physically conveys drugs to another person." Id. The term "delivery," is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance,

13

other drug, device or cosmetic whether or not there is an agency relationship." **35 P.S. § 780-102.**

Here the evidence was sufficient to prove that the Appellant delivered between 2.5 and 5 grams of cocaine to Donald Miles in exchange for one hundred and ninety dollars ($190.00). Anthony Jordan testified that he drove around for over an hour until Donald Miles' cocaine source could provide the cocaine to deliver to the confidential informant, Karl Racavitch. **(N.T. May 1, 2018 p.m. p. 40-41; May 2, 2018 p. 35-37)**. Mr. Jordan, Mr. Racavitch, and detectives testified that a short period elapsed between the Appellant's arrival and meeting with Donald Miles and then return to the vehicle with the cocaine. **(N.T. May 1, 2018 p. 15, 17-18; 67-70; May 1, 2018 p.m. p. 43-44; May 2, 2018 p. 12-13, 16)**. Detective Zech testified that he observed the Appellant's green BMW arrive, and observed the Appellant and Donald Miles walking together and entering Mr. Miles' residence for a short period of time. **(N.T. May 1, 2018 p. 67-70)**. After the transaction, the Appellant possessed one hundred and ninety dollars ($190.00) in serialized "buy money," and Donald Miles, the middle- man as well as the confidential informant, Karl Racavitch, each had the substance that a forensic scientist testified was cocaine, weighing approximately nine and one-half (9 ½) grams combined. **Id. at 79-80; May 2, 2018 p. 62, 45-44, 49-50**. Such evidence was sufficient to support the Count, I- Delivery of a Controlled Substance conviction.

Criminal Conspiracy, **18 Pa. C.S. §903(a)** is defined as follows:

> (a) Definition of conspiracy.-- A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> > (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

14

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

Id.

To sustain a conviction for criminal conspiracy:

[T]he Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy.

Commonwealth v. Murphy, 795 A.2d 1025 (Pa. Super. 2002).

"This overt act need not be committed by the defendant; it need only be committed by a co-conspirator." Commonwealth v. Hennigan, 753 A.2d 245, 253 (Pa. Super. 2000). Further, circumstantial evidence may provide proof of the conspiracy. Commonwealth v. Davalos, 779 A.2d 1190 (Pa. Super. 2001). "The conduct of the parties and the circumstances surrounding such conduct may create a 'web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." Commonwealth v. Morton, 512 A.2d 1273, 1275 (Pa. Super. 1986). Additionally:

An agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail.

Commonwealth v. Greene, 702 A.2d 547, 554 (Pa. Super. 1997); Commonwealth v. Lambert, 795 A.2d 1010, 1016 (Pa. Super. 2002); Commonwealth v. Bricker, 882 A.2d 1008, 1017 (Pa. Super. 2005).

The nature of the offenses is such that often there is no direct evidence of the defendant's criminal intent or the conspiratorial agreement. Commonwealth v. Murphy, 844 A.2d 1228, 1238 (Pa. 2004). Accordingly, the Commonwealth does not have to prove that there was an

15

express agreement to perform the criminal act; rather, a shared understanding that the crime would be committed is sufficient. **Commonwealth v. Nypaver**, 69 A.3d 708 (Pa. Super. 2013) There are four factors to be utilized in deciding if a conspiracy existed: 1) an association between alleged conspirators; 2) knowledge of the commission of the crime; 3) presence at the scene of the crime; and 4) in some situations, participation in the object of the conspiracy. **Commonwealth v. Feliciano**, 67 A.3d 19, 25 (Pa. Super. 2013).

Instantly, the evidence established a close relationship between the Appellant and Donald Miles. Anthony Jordan testified that the Appellant was Mr. Miles' cocaine source and that the Appellant previously visited Mr. Miles on at least six (6) occasions. (N.T. May 2, 2018 p. 27, 34-35, 37). The Appellant had an association with Donald Miles. In fact, Mr. Jordan testified that the Appellant was the only supplier at the time as he was the only person that came to visit at the house. Additionally, Mr. Jordan did not testify that Mr. Miles ever possessed any cocaine at their residence. It can be inferred that the common bond between Mr. Miles and the Appellant was drug trafficking. Both Mr. Jordan and Mr. Racavitch testified that they drove around waiting for Mr. Miles' cocaine source to arrive. Mr. Jordan stated: "we went straight from his house to down by my house [ . . . ] and picked up Donald. He then proceeded to tell me where to drive to. We drove through Scranton waiting for his plug to call, which was his dealer [ . . . ] when I got the text that the dealer was coming at 6:30 [ . . . ] Donald.was just pointing me in the direction to go." (N.T. May 1, 2018 p. 15, 48; May 1, 2018 p.m. p. 40-41). A jury could reasonably infer that Donald Miles was the middle-man because he was operating off the Appellant's time and trying to make contact with the Appellant.

The Appellant controlled the transaction. If Donald Miles had the cocaine on his person or obtained the cocaine inside the beer store as the Appellant argues, it would have been a

16

speedier transaction as noted by the detectives. Moreover, Mr. Jordan testified to residing with Mr. Miles and if the cocaine was located inside the residence, and/or Mr. Jordan's vehicle, the transaction would have been instantaneous. Although, the Appellant claims short periods of time within which the detectives and police did not have visual contact, the Appellant's claim is refuted by the live recorded conversations and text messages that occurred, especially the quantity of beer, which was located at Mr. Miles' feet. **N.T. May 1, 2018 p. 68-69; May 1, 2018 p.m. p. 11-16**. Detective Zech explained: "In my training and experience making undercover purchases and utilizing informants, if the drugs are in the car, it would have happened a lot sooner because I know from experience they don't want to drive around with a carload of drugs for a long period of time. And they certainly weren't doing any other extracurricular activities [ . . . ] they were waiting for drugs." **N.T. May 1, 2018 p.m. p. 33-34**.

The Commonwealth clearly presented sufficient evidence that Donald Miles did not have the cocaine and had to meet his "plug" to obtain the cocaine. In short, Donald Miles was at the whim of the Appellant as part of a drug distribution system where Donald Miles was merely a seller, and the Appellant held a higher position as supplier receiving the profits. **See Commonwealth v. Melton, 240 A.3d 162 (Pa. Super. 2020)**(finding that it was well within the province of the jury to credit the testimony of the police officers explaining the change in locations for the drug deal, and the fact that the co-defendant was known to the police as a middle man. Also within their province to conclude the defendant's actions were those of a dealer not those of a user); **Commonwealth v. Gibson, 668 A.2d 552, 555 (Pa. Super. 1995)**(holding appellant's presence with co-conspirator during entire criminal episode proved conspiracy); **Commonwealth v. Cooke, 492 A.2d 63, 68 (Pa. Super. 1985)**(holding evidence sufficient to sustain conviction of conspiracy where appellant was present at scene, strongly

17

associated with co-conspirator and personally participated in crime); **Commonwealth v. Allen, 625 A.2d 1266 (Pa. Super 1993)**(holding that conduct was tantamount to active participation in a conspiratorial agreement where defendant asked for money for his role in the transaction).

While waiting, detectives listened live to conversations between Mr. Jordan and Mr. Racavitch, referencing the cocaine source as "ATL," and describing the specific characteristics of the cocaine source, specifically that "ATL" drove a green BMW. (N.T. May 1, 2018 p. 67-70). Detective Munley stated:

> The information that we got initially didn't contain William Jordan. Again, we thought it was going to be Anthony Jordan to Donald Miles. So that was coming true, you know, what the CI initially said was happening. Donald Miles was there. Anthony Jordan was there. And through the radio – through the audio transmitter of the body wire, we were hearing word of another source. We were hearing word of ATL. We were hearing word of a green BMW. So all of that information wasn't from the CI, but that was being corroborated through what I was hearing on the live audio transmitter.

N.T. May 2, 2018 p. 63.

Similarly, Detective Zech testified that while listening live and conducting surveillance, he observed Mr. Miles exit the vehicle, and walk towards his house. Simultaneously, a green BMW arrived and parked near Mr. Miles' residence. The Appellant was not merely present at the scene of the crime, he played a key role in the conspiracy by supplying and delivering the cocaine for sale to Donald Miles to sell to various individuals on the street. Detective Zech testified that he observed the driver of the green BMW meet with Mr. Miles. A short period of time elapsed, approximately ten (10) mintues and the driver of the green BMW is observed exiting Mr. Miles house. Mr. Miles then returned to Mr. Jordan's vehicle and provided a quantity of cocaine to Mr. Racavitch. No other persons were observed approaching Mr. Miles. Thus, the

18

cocaine could have only come from the Appellant. N.T. May 1, 2018 p. 67-72. All participants had knowledge of and participation in the crime, as the Appellant was the point of contact for Donald Miles to obtain cocaine for his own use and sale to Karl Racavitch, and Anthony Jordan testified to contacting Donald Miles who had to wait for his "plug," on the date of the incident to arrange the sale. Shortly after, the Appellant's arrival at Donald Miles' residence, the transaction with Mr. Racavitch is completed. See **Commonwealth v. Beatty,** 227 A.3d 1277, 1284 (Pa. Super. 2020)(finding sufficient evidence of criminal conspiracy to deliver where the defendant had an association with his co-defendants, in that they both knew each other for years and defendant bought drugs from supplier before, was only supplier at the time and testimony revealed defendant was contacted on the date of the incident in order to arrange for a sale); **Commonwealth v. Jones,** 378 A.2d 914 (Pa. Super. 1977)(finding that in light of short periods of time when officers did not have visual contact, the jury properly inferred that the defendant possessed the heroin where the Commonwealth presented evidence of defendant's statements combined with defendant's nervous actions and other factors).

Thus, the coalescence of this circumstantial evidence sufficiently established a conspiratorial agreement. The above-described conduct and short time within which the Appellant arrives at Donald Miles' residence and then Mr. Racavitch is provided the cocaine constitutes sufficient circumstantial evidence of a conspiracy in which the Appellant and Donald Miles were jointly involved in a cocaine dealing operation. Mr. Jordan testified to referring Karl Racavitch to Donald Miles, who, waiting for the cue from the Appellant, then collected the payment, retrieved the cocaine from the Appellant and then shared the payment with the Appellant. It is clear the Appellant held an interest in the sale because he possessed a quantity of the serialized "buy money."

19

The Commonwealth published text messages, and audio recordings of the same, therefore it is a fair inference that the male driving a green BMW with the street name "ATL," was Donald Miles' "plug," meaning his dealer, and identified as the Appellant. Detective Zech recalled reviewing text messages between Donald Miles and Anthony Jordan, in which Mr. Miles reassures Mr. Jordan that "ATL is on his way to the crib [ . . . ] so we are going to bounce in five." N.T. May 1, 2018 p. 89. This is an eminently reasonable inference given that the Appellant proceeded to Mr. Miles' residence at approximately 6:30 p.m. in a green BMW, directly at a time when Mr. Miles exited Mr. Jordan's vehicle, the purpose of which was to obtain cocaine. Furthermore, the Appellant and Mr. Miles were observed leaving his residence shortly after the Appellant arrived. Thereafter, a quantity of cocaine and serialized "buy money" was recovered from Mr. Miles. Id. at 92. Importantly, serialized "buy money" was recovered from the Appellant, which demonstrates that the Appellant had an interest in the sale. Detective Zech explained: "a middle man commonly takes or keeps a portion of the monies collected to purchase drugs. That's the cost of doing business with a middle man. If you want to use their dealer, their source, you're going to pay for it. They are going to keep a little bit." N.T. May 1, 2018 p. 85.

Finally, the overt act was the Appellant's delivery of cocaine to Donald Miles at Donald Miles' residence for Donald Miles to sell on the street, including Karl Racavitch. The Appellant, as a co-conspirator, is fully liable for all the cocaine that was recovered. By these facts, a jury could reasonably find the Appellant guilty of criminal conspiracy to deliver cocaine beyond a reasonable doubt.

To sustain a conviction for Possession With Intent to Deliver, 35 P.S. § 780-113(a)(30), "the Commonwealth must prove both the possession of the controlled substance and the intent to

20

deliver the controlled substance." **Commonwealth v. Roberts**, 133 A.3d 759-767-68 (Pa. Super. 2016)(quoting **Commonwealth v. Lee**, 956 A.2d 1024, 1028 (Pa. Super. 2008). Intent to deliver, within context of offense of possession of controlled substance, may be inferred from an examination of the facts and circumstances surrounding the case. **Commonwealth v. Griffin**, 804 A.2d 1 (Pa. Super. 2002); **Commonwealth v. Campbell**, 614 A.2d 692 (Pa. Super. 1992). The trier of fact may infer that the defendant intended to deliver a controlled substance from an examination of the facts and circumstances surrounding the case. **Commonwealth v. Kirkland**, 831 A.2d 607 (Pa. Super. 2003). Where the quantity of the controlled substance is not dispositive as to the intent, the court may also look to other factors, such as "the manner in which the controlled substance was packaged, the behavior of the defendant, the presence of drug paraphernalia, and the sums of cash found in possession of the defendant." **Commonwealth v. Brockman**, 167 A.3d 29, 39 (Pa. Super. 2017)(citing **Comonwealth v. Tasamy**, 934 A.2d 1233, 1237-38 (Pa. 2007)

In the instant matter, Detective Zech testified that he seized a baggie of marijuana, one baggie of powered cocaine, two cell phones and five hundred and eighty dollars ($580.00) of currency containing one hundred and ninety dollars ($190.00) of serialized "buy money." N.T. May 1, 2018 p. 73,77-80. At the time of the Appellant's arrest, a combined total of nine and one half (9 ½) grams of cocaine was recovered. The Appellant was arrested shortly after Donald Miles delivered the cocaine to Karl Racavitch and the detectives recovered one hundred and ninety dollars ($190.00) of serialized "buy money." Id. at 79. Even though the Appellant did not engage in the hand-to-hand transaction, he delivered the cocaine to Mr. Miles, and received money for it. Additionally, Detective Zech stated: "through my training and experience with doing drug work, normally a drug trafficker has a family phone and a business phone." Id. at

21

73,78; N.T. May 1, 2018 p.m. p. 25. All the foregoing factors: two cell phones, a large sum of money commingled with serialized "buy money," text messages, surveillance, and live audio recordings as well as the forensic testimony regarding the weight of the cocaine, combined, is sufficient evidence for the fact-finder to reasonably infer that Donald Miles sold cocaine for the Appellant and that the Appellant possessed less than 2.5 grams of cocaine on his person with the intent to deliver. See Commonwealth v. Bess, 789 A.2d 757, 761-62 (Pa. Super. 2002)(upholding the trial court's finding that the packaging of 2.2 grams of cocaine, along with the recovery of a "large sum" of cash in the amount of $158, and the absence of paraphernalia associated with the personal use of cocaine was sufficient to sustain a conviction of PWID); Commonwealth v. Smagala, 557 A.2d 347 (Pa. Super. 1989)(where there is direct evidence that the defendant was involved in the distribution of narcotics, such as proof arising out of a controlled purchase by an undercover law enforcement officer or agent, the possession of even a small amount of drugs can support the inference of an intent to deliver).

C. Whether the trial court abused its discretion in failing to find the verdict is against the weight of the evidence as it relates to delivery and possession with intent to deliver since the evidence related to same was so tenuous, vague, and uncertain that the ultimate verdict is such that it shocks one's conscious?

D. Whether the trial court abuse its discretion in failing to find the verdict is against the weight of the evidence as it relates to conspiracy to deliver since the evidence as it relates to conspiracy was so tenuous, vague, and uncertain that the verdict related to same shocks one's conscious?

The weight of the evidence is supported by the jury's verdict. The determination of whether to grant a new trial because the verdict is against the weight of the evidence rests with the discretion of the trial court and will not be disturbed unless the trial court has abused its discretion. Commonwealth v. Pronkoskie, 445 A.2d 1203, 1206 (Pa. 1982). A claim that the evidence presented at trial was contradictory and unable to support the verdict requires the grant

22

of a new trial only when the verdict is so contrary to the evidence as to shock one's sense of justice. **Commonwealth v. Saksek, 522 A.2d 70, 72 (Pa. Super. 1987).** Moreover, the weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record. **Commonwealth v. Zapata, 290 A.2d 114, 117 (Pa. 1972); See also Commonwealth v. Hamilton, 546 A.2d 90, 95-96 (Pa. Super. 1988), allocator denied, 558 A.2d 531 (1989)**(holding that the scope of review for a claim that a verdict is against the weight of the evidence is very narrow, especially where issues of credibility are concerned, it is not the function of the appellate court to substitute its judgments based on a cold record for that of the trial court); **Commonwealth v. Champney, 832 A.2d 402, 408 (Pa. 2003)**(the weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses [ . . . ] an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim); **Commonwealth v. Sanders, 42 A.3d 325, 331 (Pa. Super. 2012)**( "A jury decision to credit certain evidence and reject other testimony is appropriate; therefore, the trial court did not abuse its discretion in concluding that its sense of justice was not shocked by the verdict.").

Applying the above standards to the instant case, the Appellant's guilty verdict as to Count I, Count II, and Count III, does not shock one's sense of justice such that it is against the weight of the evidence. The record supports the jury's finding of guilt. This Court incorporates the factual analysis in issues A and B herein. In this case, the Commonwealth presented seven (7) witnesses. At trial, the jury heard extensive and detailed testimony about an investigation into the trafficking of cocaine involving a confidential informant, a runner, a middle-man and a

23

source on December 13, 2017, namely Karl Racavitch's contact is Anthony Jordan, and Anthony Jordan's contact is Donald Miles, and Donald Miles' source is the Appellant. The confidential informant, Karl Racavitch, and the runner, Anthony Jordan, consistently testified that they arranged for the purchase of an "eight ball" of cocaine, priced at three hundred dollars ($300.00) via text messages and a recorded phone call observed by detectives.

Mr. Racavitch testified that he contacted Mr. Jordan in the presence of Detective Zech and Detective Munley seeking an "eight ball" of cocaine. He related that detectives outfit him with a covert audio recorder and serialized "buy money." Thereafter, Mr. Jordan testified that he contacted Donald Miles to obtain the cocaine. Mr. Jordan explained that he arranged to drive Mr. Racavitch to Mr. Miles, wherein Mr. Jordan and Mr. Racavitch learn that they must wait for Mr. Miles' source to provide the cocaine.

Both Mr. Jordan and Mr. Racavitch testified to driving around and waiting approximately one hour. While waiting, Mr. Racavitch and Mr. Jordan discuss identifying characteristics of the cocaine source, notably that he drives a green BMW and is known as "ATL." Mr. Jordan testified that "ATL" had prior dealings with Mr. Miles and he frequented their residence. Throughout the entirety of Mr. Jordan's testimony, he identified the Appellant as "ATL," and the source of the cocaine. Subsequently, both Mr. Jordan and Mr. Racavitch testified that Mr. Racavitch provided Mr. Miles with the serialized "buy money." Next, the Appellant directed Mr. Miles to exit the vehicle and meet him at the residence. Both Mr. Jordan and Mr. Racavitch testified that after waiting over an hour, within ten (10) minutes of meeting the Appellant, Mr. Miles returned to the vehicle and provided Mr. Racavitch with a quantity of cocaine.

The Commonwealth corroborates the statements and testimony of Mr. Jordan and Mr. Racavitch by observing text messages, conducting surveillance and listening live to the

24

conversations occurring inside Mr. Jordan's vehicle. The Commonwealth presented and published to the jury relevant text messages and audio recordings, which likewise corroborated the testimony of Mr. Jordan, who identified the Appellant as the cocaine source and Mr. Racavitch, who is provided with 2.63 grams of cocaine by Mr. Miles when he returned to the vehicle.

To that end, Detective Zech testified that he observed a green BMW, matching Mr. Jordan's description and driven by the Appellant. In accordance with the text messages, Detective Zech observed the Appellant meet Mr. Miles and enter Mr. Miles' residence. Moments later, Detective Zech observed Mr. Miles and the Appellant exit the residence, and Mr. Miles return to Mr. Jordan's vehicle. Inside Mr. Jordan's vehicle, Mr. Miles provided Mr. Racavitch with the cocaine. Specifically, Detective Zech stated: "Once Donald got in that car, I hear the cocaine transaction occur." **N.T. May 1, 2018 p. 72.** Detective Zech further testified that a search of the Appellant revealed one hundred and ninety dollars ($190.00) of serialized "buy money" commingled into five hundred and eighty dollars ($580.00) as well as two cell phones and approximately one gram of cocaine.

The Commonwealth also produced scientific evidence through the testimony and report of Lauren Force, who testified that the weight of the cocaine sold to Mr. Racavitch was 2.63 grams and that the weight of the cocaine on the Appellant's person was 1.06 grams. The total combined weight of the cocaine recovered from both vehicles was approximately nine and one half (9 ½) grams. The defense did not present any witnesses.

Nevertheless, the Appellant challenges the weight of the evidence by arguing that the Commonwealth did not present any "indicators" establishing the Appellant as a drug dealer, citing no evidence of a large amount of drugs, no recorded phone calls or text messages, and

25

only one (1) gram of cocaine for personal use. Instead, this Court found that the Commonwealth presented other facts indicative of the Appellant's drug dealing. Anthony Jordan identified the Appellant as "ATL," and as Donald Miles' cocaine source. Anthony Jordan, Karl Racavitch, and Donald Miles awaited the Appellant's arrival for over one hour to obtain the cocaine. Upon meeting with the Appellant, Donald Miles momentarily returned with the cocaine and provided a quantity to Mr. Racavitch. Detective Zech and Detective Munley testified that the Appellant possessed the larger amount of serialized "buy money," whereas Donald Miles possessed the smaller amount, indicative of a supplier versus a middle man. Both the Appellant and Mr. Miles profited from the transaction. The jury was free to weigh the testimony, as well as accept or reject the rationale provided by the Commonwealth for why the Appellant was not in possession of certain items. Simply put, the verdict is not so contrary to the evidence as to shock the conscience. See **Commonwealth v. Roberts**, 133 A.3d 759, 770 (Pa. Super. 2016).

The Appellant argues that the cocaine was inside Mr. Jordan's vehicle prior to Mr. Racavitch entering, and that the testimony of Mr. Jordan and Mr. Racavitch is unreliable.

To the extent that the Appellant is challenging the reliability and truthfulness of Mr. Jordan and Mr. Racavitch, this Court will not substitute its judgement for the finder of fact, who is free to believe all, part, or none of the evidence, and assess the credibility of the witnesses. See **Commonwealth v. DeJesus**, 860 A.2d 102, 107-108 (Pa. 2004)(holding that questions concerning inconsistent testimony trigger the credibility of the witnesses). Mr. Jordan identified the Appellant as "ATL" and identified the Appellant as the source of the cocaine. Mr. Jordan and Mr. Racavitch testified to driving around for over an hour until Mr. Miles' cocaine source arrived in a green BMW, as described earlier. Both testified that Mr. Miles exited the vehicle, met with the Appellant and returned to the vehicle with a quantity of cocaine. Despite the prior

26

wait, the transaction occurred within ten (10) minutes. In fact, the covert audio recordings presented by the Commonwealth eliminated Anthony Jordan as a potential cocaine source. The drug transaction occurs after over an hour of driving around and waiting. The jury was free to weigh the testimony, as well as accept or reject the rationale provided by the Commonwealth as to why Anthony Jordan could not have been the source of the cocaine, meaning the drug transaction would have occurred sooner or instantaneously if Anthony Jordan possessed the cocaine inside his vehicle. Similarly, the jury was free to determine the weight and inferences to be drawn from Anthony Jordan and Karl Racavitch's pending criminal charges or pending parole violations, as well as their desire to receive any leniency in exchange for their testimony against the Appellant. See **Commonwealth v. Thomas, 240 A.3d 921 (Pa. Super. 2020).**

Clearly, the jury found the testimony of the Commonwealth's witnesses consistent, credible and reliable enough to return a verdict of guilty on all charged offenses. As such, the jury's decision to credit the witnesses' respective statements does not render the verdict contrary to the evidence presented. A review of the record does not indicate that the verdict is "so contrary to the evidence as to shock one's sense of justice." Accordingly, this Court concludes that the Appellant's claims are without merit and this Court did not abuse its discretion.

**E. Whether the trial court erred, as a matter of law, and/or abused its discretion in allowing testimony and evidence regarding the Appellant's prior criminal record to be admitted during the trial on the basis that the Appellant "opened the door" to such evidence being allowed and/or at all since such evidence was overly prejudicial to the Appellant?**

The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment

27

exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. **Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015). Generally, all relevant evidence is admissible, and evidence is relevant if it has "any tendency to make a fact more or less probable then it would be without the evidence." **Pa. R. E. 401-402.** However, the court may exclude relevant evidence if its probative value is outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." **Pa. R. E. 403.**

**Pa.R.E. 404(b)(1)** provides:

(b) Crimes, Wrongs or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

Under certain limited exceptions, evidence of crimes other than the crime for which the defendant is on trial is admissible. For example, a litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence. **Commonwealth v. Puksar**, 951 A.2d 267 (Pa. 2008). The Pennsylvania Superior Court has stated:

> One who induces a trial court to let down the bars to a field of inquiry that is not competent or relevant to the issues cannot complain if his adversary is also allowed to avail himself of that opening. The phrase 'opening the door'...by cross examination involves a waiver. If defendant delves into what would be objectionable testimony on the part of the Commonwealth, then the Commonwealth can probe further into the objectionable area.

**Commonwealth v. Stakley**, 365 A.2d 1298, 1299-1300 (Pa. Super. 1976); See also **Commonwealth v. Patosky**, 656 A.2d 499, 504 (Pa. Super. 1995)(holding when defendant delves into what would have been objectionable testimony on Commonwealth's part, Commonwealth can probe into objectionable area); **Commonwealth v. Bey**, 439 A.2d 1175,

28

1178 (Pa. Super. 1982)(holding where defendant opens door to what otherwise might be objectionable testimony, Commonwealth may probe further to determine veracity of statement).

The Appellant argues that the Commonwealth should not have been permitted to present Mauri Kelly, the Lackawanna County Clerk of Judicial Records to testify as to whether the Appellant had any prior convictions. The Appellant also argues that the Commonwealth should not have been allowed to elicit testimony through Detective Zech regarding the Appellant's bail amount or good character.

However, in the opening statement, defense counsel raised the inference that the Appellant is not a drug dealer, utilizing this theory to distinguish the Appellant from other co-defendants, to distinguish the Appellant from characteristics known about the cocaine source and discussed on the audio recordings. Additionally, in the opening statement defense counsel also raised the inference that Detective Zech requested "high" bail amounts for the Appellant and his co-defendant and unsecured bail for Anthony Jordan in exchange for favorable testimony. **N.T. May 1, 2018 opening statement p. 16.** Following that theory, during the Commonwealth's case in-chief, defense counsel cross-examined Karl Racavitch raising the inference that the Appellant did not have a prior felony drug conviction and therefore could not have been the cocaine source alluded to in the audio recordings. **N.T. May 1, 2018 p. 46.**

Later, as a fair response to these inferences, the Commonwealth asked Detective Zech if the inference that the Appellant was not a drug dealer was accurate. Detective Zech testified: "I would find that to be inaccurate." Id. at 91. Also, as a fair response, the Commonwealth asked Detective Zech to explain the inference regarding the Appellant's high bail and Anthony Jordan's unsecured bail. Detective Zech testified: "Criminal history shows that he's a two-time convicted felon for drug trafficking here in Lackawanna County." Id. at 90. Further, defense counsel's cross-examination of Detective Zech explicitly introduced the Appellant's prior

29

criminal conviction. Defense counsel questioned: "And in regards to the record that you talked about, are you aware that my client's first conviction for a drug offense was in 1991?" **N.T. May 1, 2018 p.m. p. 4.**

As such, the Appellant is asserting to the jury, albeit implicitly, that he was not the cocaine source as described in the audio recordings, that he was not a drug dealer, and does not possess those prior conviction characteristics, rather his co-defendants were drug dealers, and he is not like his co-defendants, and that his co-defendant was treated differently by detectives and received unsecured bail in exchange for favorable testimony. Notwithstanding, the Appellant does not want the jury to know that he does possess those characteristics, that he does have prior felony drug convictions, and that bail was set high for that reason. Accordingly, this Court found that the Appellant cannot have it both ways. **N.T. May 2, 2018 oral argument p. 5-6.** Nor does it make a difference whose witness is on the stand when defense counsel opens the door.

Moreover, defense counsel engaged in a line of questioning regarding the Appellant's characteristics that went above and beyond, through no provocation from the Commonwealth and continued this theory/theme throughout the trial. In fact, defense counsel inquired why detectives requested a higher bail for the Appellant in comparison to his co-defendant as motive to lie.

Allowing the Commonwealth to introduce evidence of the Appellant's prior criminal convictions would have answered those inquires. It is apparent from the record that admission of the Appellant's prior criminal convictions is probative of issues other than propensity to commit crimes. Detective Zech's testimony articulated reasons for bail and discredited defense counsel's theory that Anthony Jordan received favors in exchange for his testimony. Detective Zech's testimony also rebutted the Appellant's claims in his opening statement of innocent association

30

and that he is not a drug dealer. Mauri Kelly's testimony discredited defense counsel's inferences in his opening statement and on cross-examination of Karl Racavitch that the Appellant does not possess the characteristics as described on the audio recordings.

To that end, this Court found Mauri Kelly's testimony admissible for the purpose of rebutting the Appellant's claim that he is not the cocaine source because he did not have felony drug convictions. See **Commonwealth v. Hernandez, 862 A.2d 647, 651 (Pa. Super. 2004)**(where defendant asserted he did not sell drugs, Commonwealth was permitted to question defendant about prior convictions that contradicted this assertion); **Commonwealth v. Trignani, 483 A.2d 862, 869 (Pa. Super. 1984)**(where Appellant claimed he never shot anyone, Commonwealth was allowed to introduce his prior conviction for aggravated robbery where Appellant shot a store clerk during the robbery); See also **Commonwealth v. Lewis, 885 A.2d 51 (Pa. Super. 2005)**(holding that Defendant's counsel's questions on cross-examination, regarding detective's previous drug transactions with co-defendant, opened the door for the Commonwealth on redirect to ask detective about the involvement of other persons in previous drug transactions with co-defendant).

This Court permitted the Commonwealth to present the testimony of Mauri Kelly and elicit testimony through Detective Zech because the Appellant opened the door for the Commonwealth to contradict the assertion that the Appellant was not a drug dealer, and that Appellant did not possess prior felony drug convictions. By distinguishing the descriptions of the cocaine source in denying a prior criminal history, the Appellant offered evidence of his good character. For example, the line of cross-examination questioning utilized by the Appellant as to Karl Racavitch constituted evidence given by the Appellant tending to prove his own good character or reputation. **N.T. May 1, 2018 p. 46.** Defense counsel questioned:

31

All right, Karl, some of the other things you talked about in those recordings when you're talking with Anthony, he's describing to you the person that he anticipates to be the source of the drugs, correct? [ . . . ] And he talks about specifically the actually the two of you talk about the guy having potentially carrying a lot of money on him correct? [ . . . ] And the indication is that this source or this person you expect typically drives around with a lot of money, correct? [ . . . ]And you talk about the fact that the source that you're expecting always carries firearms on him [ . . . ] and are you aware that my client wasn't arrested with any guns or anything on him? [ . . . ] you guys are discussing the fact that this source allegedly has a federal felony drug conviction for which he did almost 20 years in prison? [ . . . ] Are you aware that my client doesn't have a federal conviction for which he did 20 years in prison?"

**Id.** 43,45-46.

Similarly, in the opening statement, defense counsel stated:

> But Anthony Jordan was not treated like the other people who were charged. There were three people who were charged, okay, Anthony Jordan, Donald Miles, my client William Jordan. The evidence that you'll hear is that when they went in to get arraigned, Mr. Jordan and Mr. Miles are given high amounts of bail. Mr. [Anthony] Jordan is released on unsecured bail and just let go, not put in prison, not incarcerated. None of that [ . . . ] he's already beginning to get favors in exchange for what he's going to do for them [ . . . ] So what the evidence is going to show is, Donald Miles is a drug dealer [ . . . ] It's going to show that Anthony Jordan is a drug dealer [ . . . ] It's going to show that the CI himself is a drug dealer [ . . . ] What its not going to show is that my client is a drug dealer. The Commonwealth is going to interject some suspicion and ask you to assume that he is.

**N.T. May 1, 2018 opening statement p. 16-17; 23-24.**

In light of defense counsel's line of questioning, and attempt to divert culpability from the Appellant to his co-defendants, the Commonwealth was permitted to "make fair comment on the admitted evidence and provide fair rebuttal to defense arguments." <u>Commonwealth v. Spotz,</u> 18 A.3d 244, 288 ( Pa. 2011); See also <u>Commonwealth v. Radecki,</u> 180 A.3d 441 (Pa. Super.

32

2018)(stating "[e]ven an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks and must be evaluated in the context in which the comment was made).

Accordingly, this Court did not err in permitting the Commonwealth to probe further and present the testimony of Mauri Kelly regarding the Appellant's prior drug convictions. Likewise, this Court did not err in permitting the Commonwealth to elicit testimony from Detective Zech to dispel false inferences regarding the Appellant's bail amount and innocent association from his co-defendants; that he was not a drug dealer.

Finally, while the introduction of the Appellant's prior criminal conviction inherently carries some degree of prejudice, in light of defense counsel's remarks in opening statement and questions on cross-examination of Karl Racavitch and Detective Zech, this Court concluded that it did not outweigh the probative value of the evidence in this case. The purpose was to contradict the Appellant's false and unsolicited assertions of good character.

F. **Whether the trial court erred, as a matter of law, and/or abused its discretion when it failed to grant Appellant's request for a mistrial after testimony and evidence regarding Appellant's prior criminal record was presented to the jury since the unavoidable effect of not granting a mistrial was to deprive the Appellant of a fair trial?**

A motion for mistrial is within the discretion of the trial court and is required only when an incident is of such a nature that its unavoidable effect is to deprive of a fair and impartial trial causing prejudice to the defendant. It is within the trial court's discretion to determine prejudice. Therefore, the standard of review is whether the trial court abused that discretion. As previously noted, "an abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the

33

evidence of record." Commonwealth v. Antidormi, 84 A.3d 736, 750 (Pa. Super. 2014); See also Commonwealth v. Radecki, 180 A.3d 441, 457 (Pa. Super. 2018); Commonwealth v. Lively, 231 A.3d 1003, 1008 (Pa. Super. 2020)(a mistrial "is an extreme remedy that must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial.").

The admission of the Appellant's prior criminal convictions must be evaluated in the context of the record read as a whole. Nevertheless, even if this Court erred in admitting the above testimony concerning the Appellant's prior criminal convictions, such error was harmless where the uncontradicted evidence of Appellant's guilt was overwhelming. It is well established that an "error may be deemed harmless, *inter alia*, where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." Commonwealth v. Williams, 241 A.3d 1094 (Pa. Super. 2020); See also Commonwealth v. Hairston, 84 A.3d 657, 671 (Pa. 2014)(the harmless error doctrine "reflects the reality that the accused is entitled to a fair trial, not a perfect trial.").

Here, Appellant's co-conspirator, Anthony Jordan, testified in detail that it was Appellant otherwise known as "ATL," who coordinated all aspects of the drug transaction, who was Donald Miles' cocaine source, and directed Donald Miles throughout, especially the time and location wherein Donald Miles could retrieve the cocaine from the Appellant. Similarly, Karl Racavitch testified to being provided a quantity of cocaine, and that the cocaine source was a person known as "ATL," who drove a green BMW. In light of the jury's verdict on the conspiracy charge against Appellant, the jury ostensibly credited this testimony. See, e.g. Commonwealth v. Crosley, 180 A.3d 761, 768 (Pa. Super. 2018) (stating that "even the

34

uncorroborated testimony of a single witness may alone be sufficient to convict a defendant."). The jury also credited the corroborative testimony of the detectives who observed the Appellant arrive in a green BMW at the agreed upon time as described, and meeting with Donald Miles for approximately ten (10) minutes. Subsequently, possessing one hundred and ninety ($190.00) of serialized "buy money," coupled with the admission of text messages and audio recordings. Thus, even if the admission of the Appellant's prior criminal convictions prejudiced the Appellant, any such prejudice was *de minimis* and did not influence the jury's verdict. The Appellant is not entitled to relief on this claim. **See <u>Williams</u>, supra; <u>Lively</u>, supra; See also <u>Commonwealth v. Richardson</u>, 437 A.2d 1162, 1165 (Pa. 1981)**(no *per se* rule requires a new trial for every reference to prior criminal activity).

G. **Whether the trial court erred, as a matter of law, and/or abused its discretion in failing to allow relevant and competent evidence regarding the Commonwealth witnesses' probation files for purposes of impeachment which was part of the defense trial strategy?**

The Appellant contends this Court abused its discretion in precluding evidence contained within the Commonwealth witnesses' probation files. An examination of the record discloses that the Appellant's post-trial motions and memorandum of law did not challenge or allege any evidentiary error regarding the Commonwealth's witnesses' probation files. In order to preserve an issue for appellate review, it is necessary that the issue be presented initially to the trial court for decision via post-trial motions. And this is so, whether the conviction results from a trial or a plea of guilty. **<u>Commonwealth v. Williams</u>, 330 A.2d 854 (Pa. 1975).** Issues not raised in post-trial motions are deemed waived and may not be raised on appeal. **See Pa. R. A. P. 302(a).** Therefore, this issue is waived.

Alternatively, this Court granted defense counsel considerable cross-examination regarding the Commonwealth witnesses' probationary history. **N.T. May 1, 2018 p. 23-29; 31-**

35

33. Defense counsel elicited testimonial evidence at length as to Karl Racavitch's current probationary/parole status, 2014 felony drug conviction and sentence, pending probation violations, probation requirements, and dismissed charges. **Id.** Defense counsel also elicited testimonial evidence at length as to Anthony Jordan's pending criminal charges, unsecured bail status, and expectations as to leniency. **N.T. May 2, 2018 p. 18-22.**

There is no merit to the Appellant's claim, the jury heard detailed evidence of the Commonwealth witnesses' potential motive to testify favorably for the Commonwealth and adverse to the Appellant. This Court afforded the Appellant with adequate opportunity to demonstrate through cross-examination the credibility, interest or bias of the Commonwealth's witnesses, namely Anthony Jordan and Karl Racavitch. See **Commonwealth v. Murphy, 591 A.2d 278, 279 (Pa. 1991)**(a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as a juvenile delinquent); **Commonwealth v. Case, 469 A.2d 162, 165 (Pa. Super. 1983)**(The logical connection between the fact that the witness was on probation, and the inference to be drawn, that the witness might be biased toward the state, is clear and direct); **Commonwealth v. Adams, 237 A.3d 466 (Pa. Super. 2020)**(finding no trial court error where the court allowed questioning relating to [Jenkins'] probation potentially being revoked, which permitted the jury to draw inferences regarding Mr. Jenkins' potential bias).

In fact, the Appellant's cross-examination of Karl Racavitch more than adequately established that he was on probation and could be sent to prison for not cooperating with the Commonwealth. Moreover, the Appellant established that Mr. Racavitch's crimes underlying his probation were for drug offenses, and that he specifically could have gone to prison for five years. **N.T. May 1, 2018 p. 26.** Similarly, the Appellant established that Mr.

36

Jordan expected leniency albeit no specific promises from the Commonwealth relative to his pending drug offenses. **N.T. May 2, 2018 p. 21-22.** Here the record demonstrates that the Appellant fully examined the witnesses' potential biases.

**H. Whether the trial court erred, as a matter of law, and/or abused its discretion in denying Appellant's Omnibus Pretrial Motion as it related to suppression since the Commonwealth lacked reasonable suspicion and/or probable cause to stop the Appellant's vehicle and any search and/or recovered evidence resulting from the improper stop should have been suppressed?**

The standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. **Commonwealth v. LaMonte, 859 A.2d 495, 499 (Pa. Super. 2004).** The scope of review is limited:

> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

**Commonwealth v. Williams, 941 A.2d 14, 26-27 (Pa. Super. 2008)(quoting Commonwealth v. Reppert, 814 A.2d 1196, 1200 (Pa. Super. 2002).**

Moreover, it is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony. **See Commonwealth v. Clemens, 66 A.3d 373, 378 (Pa. Super. 2013).**

Here, the Appellant challenged the initial stop of his vehicle as speculative and unsupported by reasonable suspicion. The Appellant specifically sought suppression of the items seized from his person and his vehicle, namely a quantity of cocaine and marijuana, two cell phones and a large amount of cash commingled with serialized "buy money."

37

The first of three categories of interaction between police and citizen, is "mere encounter" (or request for information) which need not be supported by any level of suspicion but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause. **Commonwealth v. Fleet, 114 A.3d 849, 845 (Pa. Super. 2015).**

A police officer may detain an individual for investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. This standard, less stringent than probable cause, is commonly known as reasonable suspicion. Whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer. **Commonwealth v. Ranson, 103 A.3d 73, 77 (Pa. Super. 2014)**

During the suppression hearing, Detective Zech testified candidly that on December 13, 2017, he participated as lead investigator in a "fast-moving" investigation into the trafficking of cocaine within Lackawanna County. **N.T. April 16, 2018 p. 7.** He noted that the investigation involved the use of a covert audio recording device, wherein detectives listened live to a controlled purchase of cocaine using a reliable confidential informant. **Id. at 8, 12, 17.** While listening live, he learned that the owner of a green BMW with the street name "ATL," would be

38

providing the cocaine. **Id.** at 8-9. Detective Zech testified that while conducting surveillance and listening live to the audio recordings, he observed a green BMW approaching the agreed upon location. **Id.** at 9. Detective Zech observed the driver of the green BMW quickly meet with another male and then return to his vehicle leaving the area. Afterwards, the green BMW was subjected to a traffic stop. Detective Zech stated: "Because of the explicit conversation inside of the vehicle and being notified from the confidential informant that the transaction was made [ . . . ] we had reasonable suspicion to stop the green BMW, and I ordered a traffic stop to be conducted on the car." **Id.** at 10. He further explained: "I'm listening to it live. I can hear what they [are] saying. I know their movements, I know what they are going to be doing, they are speaking about waiting for a dealer to arrive so they can purchase the cocaine. I get instructions [ . . .] I could hear it clear as day, 'take me down to Grove Street.' They travel there. Once out of the vehicle now we learn about a black male name ATL that's going to be arriving in the BMW, green in color [ . . . ] within minutes what shows up but a green BMW." **Id.** at 20-21. Lastly, Detective Zech testified that he ordered the traffic stop of the Appellant's vehicle "based on the reasonable suspicion that drug activity was taking place." **Id.** at 27.

Therefore, in assessing the totality of the circumstances, including the audio recordings and surveillance for over an hour as well as the arrival of the Appellant in his green BMW at the agreed upon location, being described as the cocaine source, combined with the completed cocaine transaction after the Appellant returned to his vehicle, the information was specific enough that detectives were justified in suspecting criminal activity was afoot and that the Appellant was the supplier of the cocaine. The record supports this Court's conclusion to deny the Appellant's motion to suppress. See **Commonwealth v. Stilo**, 138 A.3d 33 (Pa. Super. 2016); **Commonwealth v. Griffin**, 954 A.2d 648 (Pa. Super. 2008); **Commonwealth v.**

39

Washington, 63 A.3d 797 (Pa. Super. 2013); Commonwealth v. Gutierrez, 36 A.3d 1104 (Pa. Super. 2012)(where information about man carrying heroin was provided to police from a person who identified himself, and the information placed the suspect in a particular place at a particular time in a particular vehicle, the police had reasonable suspicion that criminal activity was afoot); Commonwealth v. Cruz, 21 A.3d 1247, 1250 (Pa. Super. 2013)(where officer received radio dispatch to be on lookout for "older model green, small vehicle" since man driving it had a gun, the officer had reasonable suspicion to stop the vehicle, which matched the description, one minute later, particularly where complaining witness was in the company of the police at the time).

I.  **Whether the trial court imposed an illegal and/or overly harsh sentence by imposing each sentence in the high-end of the standard range and requiring each sentence to be run consecutively thereby making the aggregate sentence unnecessarily excessive, and in only focusing on the seriousness of the charges instead of the rehabilitative needs of the Appellant, and in otherwise failing to explain or provide adequate and/or proper basis for the excessive sentence?**

Pa. R. A. P. 302 provides that "issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Commonwealth v. Jarvis, 663 A.2d 790, 791 (Pa. Super. 1995). As such, issues challenging the discretionary aspects of sentencing must be raised in a post-sentence motion or by raising the claim during the sentencing proceedings. See Commonwealth v. Bromley, 862 A.2d 598, 603 (Pa. Super. 2004) ("It is well settled that an [a]ppellant's challenge to the discretionary aspects of his sentence is waived if the [a]ppellant has not filed a post-sentence motion challenging the discretionary aspects with the sentencing court."). In the present case, the Appellant filed a post-sentence motion and memorandum wherein, he requested that his offenses were all part of a single transaction, essentially, "the same bad act," which required that the offenses be merged, or sentences served concurrently. The

40

Appellant alleged that since this Court ordered the offenses be served consecutively, the sentence was excessive.

Notwithstanding, the Appellant failed to raise this specific claim regarding an alleged focus "on the seriousness of the charges instead of the rehabilitative needs of the Appellant, and in otherwise failing to explain or provide adequate and/or proper basis for the excessive sentence." In addition, the Appellant did not raise this specific claim contemporaneously during the sentencing hearing. As such, the Appellant did not give this Court an opportunity to reconsider or modify his sentence on this basis, and, therefore, the claim is waived. See **Commonwealth v. Reeves**, 778 A.2d 691, 692-693 (Pa. Super. 2001)(by failing to raise the specific claim that the trial court failed to state reasons for sentence on the record in post-sentence motion, the trial court was deprived of opportunity to consider claim and thus the claim was waived on appeal.); **Commonwealth v. Mann**, 820 A.2d 788 (Pa. Super. 2003); See also **Commonwealth v. Parente**, 440 A.2d 549 (Pa. Super. 1982)(Defendant's contention that he was entitled to a vacation of judgment and remand for resentencing since trial court failed to state on the record its reasons for imposing sentence was waived where defendant failed to raise such claim at sentencing or any motion for reconsideration of the sentence); **Commonwealth v. Turecki**, 420 A.2d 658 (Pa. Super. 1980)(Defendant waived any objection to failure of court below to state its reasons for sentence at time of imposing sentence, as issue was not raised at sentencing or in defendant's petition for reconsideration of sentence).

However, the Appellant's claim which challenges the excessiveness of his sentence due to the consecutive nature was properly preserved in his post-trial motion and memorandum. The merits of a discretionary sentencing issue, involve a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, Pa.R.A.P. 902, 903; (2) whether the issue was

41

properly preserved at sentencing or in a motion to reconsider and modify sentence, **Pa.R.Crim.P. 720**; (3) whether appellant's brief has a fatal defect, **Pa.R.A.P. 2119(f)**; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, **42 Pa.C.S.A. § 9781(b)**; <u>Commonwealth v. Cook</u>, **941 A.2d 7, 11 (Pa. Super. 2007)**. Accordingly, the appeal is timely, and properly preserved, therefore, this Court examines whether the Appellant raises a substantial question.

A substantial question as to the inappropriateness of a sentence under the Sentencing Code is present "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." <u>Commonwealth v. Glass</u>, **50 A.3d 720, 727 (Pa. Super. 2012)**. In the present case, the Appellant cannot demonstrate that this Court acted inconsistently with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. Importantly, the sentence is a guideline sentence, and imposed well within the statutory limits. See <u>Commonwealth v. Dodge</u>, **77 A.3d 1263, 1272 n. 8 (Pa. Super. 2013)**.

The Appellant contests this Court's imposition of consecutive sentences, which he alleges makes the sentence excessive. "The general rule in Pennsylvania is that in imposing a sentence the court has discretion to determine whether to make it concurrent with or consecutive to other sentences then being imposed or other sentences previously imposed." <u>Commonwealth v. Graham</u>, **661 A.2d 1367, 1373 (Pa. 1995)**. A challenge to the imposition of consecutive rather than concurrent sentences, however, does not present a substantial question. <u>Commonwealth v. Johnson</u>, **873 A.2d 704, 709 n. 2 (Pa. Super. 2005)**. Such a claim may raise a substantial question "in only the most extreme circumstances, such as where the

42

aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." Commonwealth v. Dodge, 77 A.3d 1263, 1270 (Pa. Super. 2013); See also Commonwealth v. Cruz-Centeno, 668 A.2d 536, 545 (Pa. Super. 1995) quoting, Commonwealth v. Urrutia, 653 A.2d 706, 710 (Pa. Super. 1995)("An allegation that a sentencing court failed to consider or did not adequately consider certain factors does not raise a substantial question that the sentence was inappropriate."); Commonwealth v. Coss, 695 A.2D 831, 833 (Pa. Super. 1997)(An allegation that a sentence is manifestly excessive fails to raise a substantial question when the sentence-imposed falls within the statutory limits); Commonwealth v. Cannon, 954 A.2d 1222, 1228-29 (Pa. Super. 2008)(a claim that the trial court failed to consider the defendant's rehabilitative needs, age and educational background does not present a substantial question).

Based upon the testimony and evidence presented during a two- day jury trial, as well as review of the pre-Sentence investigation, and the Sentencing Guidelines, considering the commentary by defense counsel and the Commonwealth at the time of sentence, this Court did not find that the Appellant should be afforded a "volume discount" for his crimes by having all sentences run concurrently. This Court imposed sentence with due regard to various factors and the Appellant fails to raise a substantial question. See Commonwealth v. Hoag, 665 A.2d 1212 (Pa. Super. 1995); See also Commonwealth v. Anderson, 650 A.2d 20, 22 (Pa. 1994)(raising a concern that defendants not be given "volume discounts" for multiple criminal acts that arose out of one larger criminal transaction); Commonwealth v. Rhoades, 8 A.3d 912, 919 (Pa. Super. 2010) (stating that where the sentencing court had the benefit of a pre-sentence investigation report, it may be assumed that the sentencing court was aware of all relevant information regarding a defendant, including any mitigating factors); Commonwealth

43

v. Devers, 546 A.2d 12 (Pa. 1988) (holding that where a pre-sentence report exists, there is a presumption that the sentencing judge was aware of and adequately considered information relevant to the defendant's character, as well as any mitigating factors).

Finally, a sentence imposed within the guidelines may be reversed only if application of the guidelines is clearly unreasonable. **Commonwealth v. Macias**, 968 A.3d 773, 777 (Pa. Super. 2009). Unreasonable means a decision that is either irrational or not guided by sound judgment. **Commonwealth v. Walls**, 926 A.2d 957, 963 (Pa. 2007). Further, a trial court is not required to provide a statement of reasoning for a sentence imposed within the standard range of the sentencing guidelines. **Commonwealth v. Leatherby**, 116 A.3d 73, 83 (Pa. Super. 2015).

Here, the sentence in this case simply does not present "extreme circumstances," nor is the sentence unduly harsh or unreasonable considering the nature of the crimes, and the Appellant's leadership role as supplier in a cocaine trafficking operation involving a middle-man and a runner. In fact, the Appellant held a street name.

The Appellant faced a maximum sentence of forty-nine (49) years' incarceration. However, this Court imposed an aggregate incarceration sentence of five and one half (5 ½) years to twelve (12) years which was well within the maximum allowed, as the Appellant was subject to an enhanced sentence for a prior drug trafficking offense.

The sentencing record reflects that this Court considered the Appellant's previous convictions for dealing drugs, especially that he had served substantial prison time for those offenses. This Court found that the Appellant continued to circulate drugs into the community. The standard range of the guidelines for delivery of a controlled substance is twenty-one (21) – twenty-seven (27) months based on the Appellant's prior record score of five (5), which the Appellant received a minimum at the high end of the standard range. The standard range for

44

conspiracy to deliver a controlled substance is twelve (12) – eighteen (18) months, which the Appellant received a minimum at the high end of the standard range, and the standard range for possession with intent to deliver a controlled substance is twenty-one (21)- twenty-seven (27) months, which the Appellant received a minimum at the low end of the standard range. Discretion was imposed in directing the sentences be served consecutively. The Appellant committed two (2) separate felony drug offenses facilitating a drug trafficking scheme. In fact, the Appellant's drug trafficking has been evolving since 1991. Accordingly, the decision to impose consecutive, rather than concurrent sentences does not present a substantial question for review.

BY THE COURT,

_____, J.

Michael J. Barrasse

CC: Notice of the entry of the foregoing Memorandum has been provided to each party pursuant to Pennsylvania Rule of Criminal Procedure 114 by emailing time-stamped copies to the following individuals:

**Lisa Swift, Esq.**
**Terrence McDonald, Esq.**

45